**CRISTINA INVESTMENT CORPORATION and Cris Realms, Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 95–128L.

United States Court of Federal Claims.

Feb. 25, 1998.

Robert E. Arceneaux, New Orleans, LA, for plaintiffs.

Dorothy R. Burakreis, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant. Elizabeth Griffin, United States Army Corps of Engineers, of counsel.

## OPINION

MEROW, Judge.

Plaintiffs Cristina Investment Corp. and Cris Realms, Inc., claim that the U.S. Army Corps of Engineers' ("Corps") selection of an alignment for a government levee effectively proscribed the development of their wetland property, and therefore gave rise to a taking of that property under the Fifth Amendment to the U.S. Constitution entitling them to $2,156,000.00 in just compensation. A different alignment for a private levee which would have enabled development had been proposed by Bayou des Familles Development Corp. ("BDF"), which owned similarly situated wetland property. On September 21, 1979, the Corps denied BDF's permit application reflecting that alignment on the merits. This matter is now before the court on cross-motions for summary judgment on liability.

Defendant argues that plaintiff Cristina's claim is barred by the six-year statute of limitations governing claims brought before this court. 28 U.S.C. § 2501 (1994). In particular, defendant maintains that all events fixing the potential liability of the government for the alleged taking occurred by September 21, 1979, when the Corps denied BDF's permit application to construct a levee which would have enabled the development of both BDF's and plaintiffs' wetlands. In an unpublished order, this court rejected BDF's takings claim as barred by 28 U.S.C. § 2501. *Bayou des Familles Dev. Corp. v. United States,* No. 91–1315L (Feb. 23, 1996). The Federal Circuit sustained that result on

appeal. *Bayou des Familles Dev. Corp. v. United States,* 130 F.3d 1034 (Fed.Cir.1997). Defendant adds that plaintiff Cris' takings claim fails because it did not own the subject property at the time of the alleged taking in 1979.

Plaintiffs note that, notwithstanding the 1979 Corps denial, legal challenges to that denial and local political debate left open the possibility that either BDF or the Corps would locate a levee along the alignment which would enable wetland development. Analogizing to the *Dickinson* stabilization principle which provides that a takings claim arising from a continuing physical process does not accrue until the physical situation has stabilized, *United States v. Dickinson,* 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947), plaintiffs argue that their claim did not accrue until the political situation stabilized. Plaintiffs maintain that stabilization was achieved in 1989 when Jefferson Parish Levee District ("the District") filed expropriation suits against them to acquire property for the right-of-way to construct the levee along the disadvantageous alignment. It was not until that time, according to plaintiffs, that the decision concerning the levee's location was finally determined, wetland development was foreclosed, and their takings claim accrued. Alternatively, plaintiffs argue that the December 18, 1990 Local Cooperation Agreement ("LCA") between the Corps and the District, delineating the responsibilities of both parties regarding the construction and maintenance of the levee along the disadvantageous alignment, had this accrual effect.

As explained below, the *Dickinson* stabilization principle is limited to takings claims involving a continuous physical process, *Ariadne Fin. Servs. Pty. Ltd. v. United States,* 133 F.3d 874, 878–79 (Fed.Cir.1998); *see also Fallini v. United States,* 56 F.3d 1378, 1381–82 (Fed.Cir.1995), *cert. denied,* 517 U.S. 1243, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996), and therefore is not the proper analytical framework to apply to determine when a takings claim challenging a government permit denial accrues. Rather, the proper framework is provided by ripeness doctrine as annunciated in *Suitum v. Tahoe Reg'l Planning Agency,*

520 U.S. 725, ——–——, 117 S.Ct. 1659, 1665–67, 137 L.Ed.2d 980 (1997), *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) and *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), and applied by the Federal Circuit to federal takings claims. *Bayou des Familles*, 130 F.3d at 1037–38; *Howard W. Heck and Associates, Inc. v. United States*, 134 F.3d 1468, 1470–71 (Fed.Cir.1998). That doctrine provides that a government denial will be considered final, and any federal takings claim arising from that denial will therefore accrue, if the property owner made a proper application which the government denied both on the merits and in such a manner as to reveal that reapplication for a modified plan would be futile. Efforts to secure the reversal of that denial do not operate to deprive such a denial of finality. *See Williamson*, 473 U.S. at 192–93, 105 S.Ct. at 3119–20. Exhaustion of such potential remedies is not required to ripen a takings claim, and does not prevent the accrual of that claim.

Both the manner and circumstances surrounding the Corps 1979 denial reveal that the denial was final. The Corps denial addressed the merits of BDF's proposal, rejected the proposal on ecological grounds, and was based upon the unchanging fact that the wetlands at issue here fell within a protected zone of a national park. *See Bayou des Familles*, 130 F.3d at 1040; *West Jefferson Levee Dist. v. Coast Quality Constr.*, 640 So.2d 1258, 1284–88 (La.1994), *cert. denied*, 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d 639 (1995). Accordingly, plaintiff Cristina's takings claim accrued on September 21, 1979, when the Corps denied BDF''s permit application to construct the levee along an alignment which would have enabled Cristina to develop its wetlands. Because Cristina's claim was filed more than six years after that date, the claim is barred by the statute of limitations. Plaintiff Cris' takings claim fails because it did not own the subject property at the time of the alleged taking. *United States v. Dow*, 357 U.S. 17, 22, 78 S.Ct. 1039, 1044–45, 2 L.Ed.2d 1109 (1958); *Argent v. United States*, 124 F.3d 1277, 1287 (Fed.Cir. 1997). Plaintiffs' motion for summary judg-

ment is therefore denied. Defendant's motion for summary judgment is granted.

## FACTS

This takings claim, as in *Bayou des Familles Dev. Corp. v. United States*, 130 F.3d 1034, arose from the controversy surrounding the location of a levee in Jefferson Parish, Louisiana. Beginning in the early 1970s, the Corps had under consideration a number of different alignments for a levee project designed to protect portions of coastal Louisiana from hurricane destruction and flooding from the Mississippi River. In the reaches affecting the property at issue here, there were two alternatives. *West Jefferson Levee Dist.*, 640 So.2d at 1267. One levee alignment would have protected existing developed property from hurricane and flood damage, but would have placed undeveloped wetlands outside the levee's protection. The other alignment would have placed wetlands within the levee's protection, thereby enabling their draining and development. The choice between these different alignments was controversial because the decision would potentially determine the growth-conservation line for the development of Jefferson Parish, *West Jefferson Levee Dist.*, 640 So.2d at 1265, and, more particularly, whether approximately 2,000 acres wetlands would be drained and developed.

On August 21, 1972, while the Corps was considering its hurricane levee project, BDF purchased those 2,000 acres of wetlands, largely swamp and freshwater marsh, within the levee project area. Plaintiff Cristina purchased approximately 88.5 acres of these wetlands on August 15, 1977 and March 7, 1978. Plaintiff Cris purchased a 20% interest in approximately 19 acres of these wetlands in 1987. As part of the consideration for the sale to plaintiff Cristina, BDF promised to complete a levee and pumping station which would enable the development of Cristina's wetlands.

In July and August 1973, prior to plaintiffs' purchase of the wetlands, BDF entered into contracts to construct a levee and pumping station designed to facilitate the draining of the wetlands for development. Without hav-

ing obtained a permit from the Corps as required by the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 (1994), and the Clean Water Act of 1972, 33 U.S.C. § 1344 (1994), BDF began constructing the levee and pumping station. On January 15, 1974, the Corps ordered BDF to stop work, and required BDF to file an after-the-fact permit application. Together with an environmental impact statement, BDF filed that application in December of 1975.

While the BDF application was pending, Congress authorized the creation of the Jean Lafitte National Park on November 10, 1978. 16 U.S.C. §§ 230–231d (1994). That Act established a 8,600 acre park core area and an 11,400 acre park protection zone. The boundaries of both the core area and the protection zone were established by statute, and could only be revised by the Secretary of the U.S. Department of the Interior with the consent of Jefferson Parish. 16 U.S.C. §§ 230, 230a(a), 230a(f). The statute prescribed that the core area of the park be preserved, and instructed local authorities to establish land use regulations for the protection zone which would preserve specified natural resource values. 16 U.S.C. § 230a(b), (c)(1)-(4). Plaintiffs' wetlands are within the protected zone. Plf. Statement of Facts, at 1–2.

On September 21, 1979, the Corps denied BDF's permit application to construct the levee along the alignment which would have enabled the development of both BDF's and plaintiffs' wetlands. In its denial, the Corps found that:

> The project, if completed, would have major adverse impacts on fish and wildlife. In its natural state, it provides food and shelter for a variety of animal life. Detritus from the swamps and marshes enter the Barataria Bay Estuary through tributaries of Lake Salvador. If completed, the project will change more than 2,300 acres of habitat to residential and commercial areas. All of this valuable habitat would be lost and much of the animal life lost. Included in the habitat to be destroyed are more than 600 acres of woodland, 920 acres of swamp, and 430 acres of marsh.

Def. Summ. J. Ex. 1D2 at 4. Based upon these findings, the Corps concluded that the project would violate the regulatory standards governing the issuance of permits under the Clean Water Act. See 40 C.F.R. §§ 230.1–230.80 (1997); 33 U.S.C. § 1344; Def. Summ. J. Ex. 1D2 at 4 (BDF project would have major negative environmental impacts, project not water dependent, and alternative non-wetland sites available for development).

BDF filed suit challenging the Corps denial on November 21, 1979, seeking both to reverse the denial, and to enjoin the Corps from placing its own levee along an alignment which would effectively prevent the draining and development of the wetlands. *Bayou des Familles Dev. Corp. v. United States Corps of Eng'rs,* 541 F.Supp. 1025 (E.D.La.1982), *aff'd,* 709 F.2d 713 (5th Cir. 1983) (table), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984). In 1982, the district court ruled on BDF's challenge, holding that the Corps denial was not arbitrary and capricious, that it could not order the Corps to place its own levee along BDF's preferred alignment, and that any claim for uncompensated takings of property arising from the denial could only be brought before this court. *Bayou des Familles,* 541 F.Supp. at 1041–42.

As BDF pursued its challenge against the Corps, the District applied to the Corps to construct a levee along essentially the same alignment BDF had proposed. *West Jefferson Levee Dist.,* 640 So.2d at 1267. In November 1980, the Corps notified the District that its permit application would likely be denied for the same reasons BDF's permit had been denied. *Id.* On June 18, 1984, the Corps offered the District a permit to construct the levee along the alignment disadvantageous to plaintiffs. Although the District continued to press the Corps to approve the BDF alignment, it finally accepted the Corps permit to construct the levee along the alignment disadvantageous to plaintiffs on February 25, 1986. Throughout 1989, the District filed a series of expropriation suits against BDF, plaintiffs and other similarly situated property owners seeking the rights-of-way necessary to construct the levee along that alignment. Def. Summ. J. Ex. 9, 10.

BDF, among others, responded to the expropriation suits with demands for additional compensation beyond that deposited by the District with the court, disagreeing with the District's view that compensation for the rights-of-way should not embrace the speculative development value of the both the right-of-way property and the property which would remain on the unprotected side of the levee. In the course of rejecting the landowner's claims, the Louisiana Supreme Court noted that "the Corps denied BDF's permit application, and would have continued to deny landowners applications [for a levee which would have enabled development]" *West Jefferson Levee Dist.*, 640 So.2d at 1284, concluding that:

> It is clear from the record that BDF's permit application was denied by the Corps in 1979 because of the desire to preserve the wetlands in the park protection zone as undeveloped wetlands and because BDF's permit application did not meet the criteria for the granting of a permit.

*Id.* at 1288.

BDF filed its takings claim in this court on July 25, 1991, first alleging that the Corps 1979 denial gave rise to a temporary taking of their wetlands, which in some manner then matured into an "actual taking" in either 1989 when the District filed its expropriation suits, or in 1990 when the District and the Corps signed the LCA. BDF Compl. ¶ 65. BDF later amended its complaint by deleting its claim for a temporary taking, and newly alleging that it was the Corps decision in 1986 to grant the District a permit for construction of the levee along the disadvantageous alignment which gave rise to the taking. BDF First Amend. Compl. ¶ 40. Plaintiffs filed their complaint in this case on February 21, 1995. Raising a number of legal arguments not considered in the BDF claim, they allege that the District's 1989 filing of expropriation suits, or the 1990 LCA, gave rise the taking of their property.

**ANALYSIS**

■ Claims brought before this court are governed by a six-year statute of limitations. 28 U.S.C. § 2501. This six-year time limit is jurisdictional, leaving the court without the power to entertain a claim filed beyond that time. *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957); *Hart v. United States,* 910 F.2d 815, 818 (Fed.Cir.1990). A claim accrues for statute of limitations purposes "when all of the events necessary to fix the alleged liability of the government have occurred and the claimant is legally entitled to bring suit," *State of Alaska v. United States,* 32 Fed.Cl. 689, 698 (1995) (citing *Kinsey v. United States,* 852 F.2d 556, 557 (Fed.Cir.1988)), not at some later time when "a claimant becomes certain he can prevail on the merits." *State of Alaska,* 32 Fed.Cl. at 701.

■ A property owner raising a takings claim of this kind is legally entitled to bring suit if the government has finally denied a proposed use, *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, ——— ———, 117 S.Ct. 1659, 1665–67, 137 L.Ed.2d 980 (1997); *Bayou des Familles,* 130 F.3d at 1038; *Heck v. United States,* 134 F.3d 1468, 1470–71, that purportedly takes his property for public use without just compensation.[1] *See Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994).

## I. Dickinson *Stabilization Principle*

■ Plaintiffs argue that the *Dickinson* stabilization principle should be applied here to deprive the 1979 Corps denial of finality and thereby delay the accrual of their takings claim until it became clear that the government levee would not follow the advantageous alignment. The *Dickinson* stabilization principle provides that a government taking of land which occurs by a continuing process of physical events postpones the accrual of that claim until those events have stabilized. *Dickinson,* 331 U.S. at 749, 67 S.Ct. at 1385; *see also Applegate v. United States,* 25 F.3d 1579 (Fed.Cir.1994). Plaintiff here argues that this rule should be applied to a takings claim not involving a continuing

---

1. The takings clause of the Fifth Amendment to the U.S. Constitution provides "[n]or shall private property be taken for public use without just compensation." U.S. Const. amend. V.

process of physical events, but rather a continuing process of legal and political events.

In *Dickinson,* the plaintiff claimed that the flooding of his property by a federal dam gave rise to a taking of a flowage easement. The government maintained that this claim was time-barred because it was filed more than six years after the first flooding event. The Court rejected this argument on the ground that "[t]he source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous," *id.* at 749, 67 S.Ct. at 1385, and ruled that the claim therefore did not accrue until that physical situation had stabilized. *Id.* at 748, 67 S.Ct. at 1384–85. Here, by contrast, the source of the entire claim is premised upon the denial of a government permit to construct a private levee. This was a single event.[2]

Plaintiffs' invitation to extend the principle announced in *Dickinson* to embrace a continuing process of legal or political events has been rejected by the Federal Circuit. *Fallini,* 56 F.3d at 1381–82; *Alder v. United States,* 785 F.2d 1004 (Fed.Cir.1986). In *Alder,* for example, the plaintiff held grazing permits to federal land which expired when a federal law returned the land to an Indian tribe. The tribe allowed the plaintiff to continue to use the land for three years, but at the end of that time made clear that grazing would no longer be permitted. 785 F.2d at 1007–08. At the same time, federal legislation and litigation were pending which sought to compensate permit owners for improvements made to the formerly leased grazing lands. *Id.* at 1008. To avoid the statute of limitations time-bar, plaintiff maintained that *Dickinson* applied to defer the accrual of his takings claim until it was clear that the compensation scheme would not fully compensate their loss. Rejecting this argument, the Federal Circuit held that the activities which followed the denial of use were "not the quality of continuing events that *Dickinson*

contemplated in its holding that the cause does not accrue 'until the situation becomes stabilized.' " *Id.* (quoting *Dickinson,* 331 U.S. at 749, 67 S.Ct. at 1385). The plaintiff's takings claim accrued when he was no longer permitted to use the former federal lands. *Id.* at 1009.

■ More recently, the Federal Circuit has definitively held that the *Dickinson* stabilization principle "does not apply outside its context" of flooding cases. *Ariadne Fin. Servs. Pty. Ltd.,* 133 F.3d 874, 878–79. Rather, the proper analytical framework to be applied to a takings claim which, as here, challenges a permit denial is ripeness doctrine as applied in *Suitum,* 520 U.S. 725, 117 S.Ct. 1659, 137 L.Ed.2d 980, *Williamson,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126, and *MacDonald,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285. *See Bayou des Familles,* 130 F.3d at 1037; *Heck,* 134 F.3d 1468, 1470–71.

## II. The Accrual of a Regulatory Takings Claim

Plaintiffs argue that their takings claim did not accrue until it became clear that the Corps would not either directly overturn its 1979 denial, or effectively overturn it by choosing to construct its own levee along the alignment advantageous to plaintiffs. This argument presumes that the evolution of legal challenges to a permit denial and wholly independent government decision-making processes may deprive a government determination of finality, and thereby delay the accrual of a takings claim. Exhaustion of administrative, judicial or other potential remedies which would directly or effectively overturn the denial, however, do not affect a property owner's legal entitlement to bring a takings claim. Accordingly, resort to such procedures does not defer the accrual of that claim.

2. While the government might have chosen to locate its own levee along the advantageous alignment after the 1979 denial, plaintiffs admit that they had no compensable property interest in a government flood control levee:

Cristina had no need for, desire for, or expectancy in a government-provided flood protec-

tion levee, and Cristina does not claim it was deprived of any such expectancy. *Rather, Cristina claims BDF was deprived of the ability to complete its own levee* and, as a consequence, of all economically viable use of their private property. . . .

Plf. Mot. Summ. J. at 30 (emphasis added).

### a. Requirement for Finality not Exhaustion

■ A property owner aggrieved by a federal government permit denial has two distinct avenues of judicial recourse available. That owner may bring a claim in district court challenging the denial on its merits. By such a claim, a property owner seeks reversal of the denial, and ultimately the right to engage in the proscribed use. Alternatively, that owner may bring a takings claim here, seeking not reversal of the permit denial, but rather compensation for it.[3] Two different ripeness requirements apply to these distinct claims. In order to ripen the district court challenge, a property owner is typically required to exhaust any potential administrative remedies before he will be heard in court. By contrast, a property owner is not required exhaust remedies directed at reversing the government denial in order to bring a takings claim in this court. All that is necessary to ripen a federal takings challenge of this kind is a final decision from the government on the proposed use.[4] See Williamson, 473 U.S. at 192–93, 105 S.Ct. at 3119–20.

Given the similar bases for these two distinct claims, a takings plaintiff will often erroneously assert that challenges to the permit denial legally affect the ripening of his takings claim. In particular, a takings plaintiff will argue that his takings claim is ripe because the permit denial may not be appealed administratively. See, e.g., Loveladies Harbor v. United States, 15 Cl.Ct. 381, 386–

87 (1988). Second, as here, a takings plaintiff attempting to avoid the statute of limitations time-bar will assert that administrative or other challenges directed at overturning the denial delayed the ripening of his takings claim, and thereby the accrual of that claim.

In Williamson, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126, however, the Supreme Court provided that challenges to a government denial are different in kind from a takings claim, and do not bear upon whether the takings claim is ripe for adjudication. In that case, the government argued that the takings claim was unripe because, after an initial denial of a land use plan, the plaintiff failed to pursue a variance procedure which could have resulted in the approval of a different, less-intensive plan. The plaintiff countered that the exhaustion of administrative remedies was not required to ripen his takings claim. The Court agreed with the general proposition advanced by plaintiff, but disagreed with his characterization of the variance requirement as one of exhaustion. Rather, explained the Court, the potential availability of a variance deprived the initial denial of finality:

> The question of whether administrative remedies must be exhausted is conceptually distinct ... from the question of whether an administrative action must be final before it is judicially reviewable ... While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive posi-

---

3. In a takings claim, the plaintiff must concede the validity of the government action that is the subject of his claim. This is a jurisdictional requirement, and stems from the fact that the takings clause of the Fifth Amendment does not empower the court to award just compensation for the *unauthorized* acts of government officials. *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed.Cir.1993) (If "the taking is unauthorized, the acts of defendant's officers may be enjoinable, but they do not constitute taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or prior owner.") (quoting *Armijo v. United States*, 663 F.2d 90, 95, 229 Ct.Cl. 34, 40 (1981)). That is, the takings clause does not empower the government to act beyond its au-

thority so long as it pays compensation for doing so.

4. Where the property owner is challenging a state or local law, ripeness doctrine requires that he not only secure a final determination, but that he also seek just compensation in state court before bringing his claim in federal court. *See Suitum*, 520 U.S. at ——, 117 S.Ct. at 1665 ("if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and has been denied just compensation") (quoting *Williamson*, 473 U.S. at 195, 105 S.Ct. at 3121). This second requirement is not implicated by a challenge to federal law. *See generally* Gregory M. Stein, *Regulatory Takings and Ripeness in the Federal Courts*, 48 Vand. L.Rev. 1 (1995).

tion on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. . . .

*Id.* at 192–93, 105 S.Ct. at 3119–20. Challenges to overturn a government denial is not required to ripen a takings claim, the Court went on to explain, because the success of such challenges would not afford the takings plaintiff the relief of just compensation that he seeks. *See id.* at 193, 105 S.Ct. at 3120.

The Federal Circuit has recognized such challenges do not delay the accrual of a takings claim. In *Loveladies Harbor v. United States,* 27 F.3d 1545 (Fed.Cir.1994) (in banc), the Federal Circuit found that the filing of a district court challenge to a permit denial was no bar to filing a takings claim in this court.[5] In so holding, the court noted that "[i]t may not always be possible because of the statute of limitations for a plaintiff to wait for the regulatory challenge case to be finally concluded before filing in the Court of Federal Claims." *Id.* at 1555. Further, even in the case where an administrative or district court challenge must be brought before the takings claim in order to settle a dispute concerning property ownership, the Federal Circuit has held that litigation to settle that issue does not prevent the accrual of the takings claim. *Aulston v. United States,* 823 F.2d 510, 513–14 (Fed.Cir.1987) (reversing dismissal and remanding with order to stay takings claim so that the statute of limitations would not expire while plaintiff pursued mandatory agency procedure).[6]

### b. Determining Finality

 Accordingly, the pursuit of administrative or other potential remedies directed at overturning the Corps 1979 denial did not prevent the accrual of plaintiffs' takings claim. The relevant issue implicated by the determination of when a takings claim of this kind accrues, rather, is whether the government decision at issue is final. Such a decision generally will not be considered final if the government has the discretion to consider a modified plan, but the applicant has not asked the government to exercise that discretion. *See Suitum,* 520 U.S. at ——, 117 S.Ct. at 1667. This finality requirement reflects the recognition that "[l]and use planning is not an all-or-nothing proposition. A governmental entity is not required to permit a landowner to develop property to [the] full extent he might desire or be charged with an unconstitutional taking of the property. . . ." *MacDonald,* 477 U.S. at 347, 106 S.Ct. at 2565. Accordingly, in *Williamson* and *MacDonald,* the Court rejected takings claims brought by developers after a first denial of a development plan on ripeness grounds because both developers could have, but did not, seek approval for a less intensive development plan. *Williamson,* 473 U.S. at 190, 105 S.Ct. at 3118; *MacDonald,* 477 U.S. at 350–51, 106 S.Ct. at 2566–67. Pursuit of such approval is required to ripen a takings claim unless the applicant demonstrates that such reapplication would be futile. *MacDonald,* 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7 (1986); *see also Heck,* 134 F.3d at 1471–72 (purpose of futility exception is "to protect property owners from being required

---

**5.** The Federal Circuit held that 28 U.S.C. § 1500 ("The United States Court of Federal Claims shall not have jurisdiction of any claims for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States. . . ."), is no bar in such a case because the two challenges seek different relief. *Loveladies,* 27 F.3d at 1555 ("For the Court of Federal Claims to be precluded from hearing a claim under § 1500, the claim pending in another court must arise from the same operative facts, and must seek the same relief.").

**6.** In finding the 1979 Corps denial final as applied to BDF, the Federal Circuit relied, in part,

upon the rationale that neither the Clean Water Act nor Corps regulations provide for an administrative appeal of a permit denial. *Bayou des Familles,* 130 F.3d at 1040. The question of whether such an administrative appeal is available, however, implicates whether the plaintiff would be required to exhaust such an appeal before challenging the denial in district court, see Proposal to Establish an Administrative Appeal Process for the Regulatory Programs of the Corps of Engineers, 60 Fed.Reg. 37,280, 37,290 (July 19, 1995) (proposed appeals process would be precursor to district court challenge to permit denial), not upon whether the denial is final for the purpose of presenting a ripe takings claim.

to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved") (quoting *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990)).

While neither the Clean Water Act nor its implementing regulations limit the Corps' discretion to consider a different permit application for a less intensive proposal after an initial denial, the manner and circumstances surrounding the Corps denial of BDF's permit application indicate that such reapplication would have been futile. The Corps denial addressed the merits of BDF's proposal, and rejected the proposal on ecological grounds. Further, as both the Federal Circuit and the Louisiana Supreme Court noted, the Corps denial was based upon an unchanging fact that the wetlands at issue here were within a protected zone, and that therefore no permit would have been granted for a project which would facilitate their development. See *Bayou des Familles,* 130 F.3d at 1040; *West Jefferson Levee Dist.,* 640 So.2d at 1284.

### III. Persons Entitled to Bring Claim

It is well-established that only the owner of the property at the time of the alleged taking may assert a takings claim. *Dow,* 357 U.S. at 22, 78 S.Ct. at 1044 ("[t]he owner at the time [of the taking] rather than the owner at an earlier or later date, is the one who has the claim and is to receive payment"); *Argent,* 124 F.3d at 1287; *Lacey v. United States,* 595 F.2d 614, 619, 219 Ct.Cl. 551, 560 (1979). Since the takings claim here accrued in 1979, and plaintiff Cris did not purchase their interest in the wetland property until 1987, that claim fails under the rule of *Dow.*

### CONCLUSION

Efforts to secure the reversal a permit denial are not required to ripen a takings claim, and therefore do not delay the accrual of such claim. Rather, a takings claim accrues when the government has made a final determination on the merits of a property owner's proposed use. Because the Corps September 21, 1979 was such a final denial, plaintiffs takings claim accrued on that date. As plaintiffs' February 21, 1995 complaint in this matter was filed more than six years after that denial, their takings claim is barred by the statute of limitations.

Accordingly, it is **ORDERED** that defendant's motion for summary judgment is **GRANTED.** Plaintiffs' motion for summary judgment is **DENIED.** Final judgment shall be entered dismissing the complaint with no costs to be assessed.