**MOBLEY CONSTRUCTION COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 04–1739L.**

United States Court of Federal Claims.

Oct. 28, 2005.

---

Charles R. Nestrud and Ann P. Faitz, Chisenhall, Nestrud & Julian, P.A., Little Rock, AR, for plaintiff.

Steven D. Bryant, Natural Resources Section, Environmental and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. David E. Sirmans and Ann M. Cornett, United States Army Corps of Engineers, Memphis District, Memphis, TN, of counsel.

## ORDER AND OPINION

HODGES, Judge.

Plaintiff Mobley Construction Company filed this claim against the United States under the takings clause of the Fifth Amendment to the United States Constitution. The Government had issued plaintiff a series of permits since the 1930's to dredge portions of the White River in Arkansas. The permit the Army Corps of Engineers authorized in November 1995 imposed two new restrictions. Special Condition 2 is the limitation in dispute in this case.

Special Condition 2 prohibited dredging along twenty miles of the White River during March, April, and May of each year. This period coincided with fish spawning in the area. Plaintiff complains that Mobley's not being able to dredge for three months each year created a temporary or a permanent taking by the Government because the re-

striction prevented profitable operations in the White River. Mobley ceased operations there in 2000.

Defendant argued in its Motion to Dismiss that we lack jurisdiction because the statute of limitations has run on the alleged taking. We grant the Government's Motion to Dismiss.

## BACKGROUND

Plaintiff Mobley Construction has been engaged in mining sand and gravel for commercial production since the 1930's. Compl. ¶ 7. Persons who conduct dredging operations must obtain permits from the Army Corps of Engineers pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. The Corps leased to Mobley the right to dredge the White River in Arkansas for sand and gravel and to remove it from the riverbed in designated areas.[1] Compl. ¶ 7. Plaintiff has had at least three government-issued dredging leases.

Mobley sought routine renewal of its permit with the Corps in 1995. Compl. ¶ 9. The Corps issued the permit but for the first time restricted dredging to protect fish spawning areas. Special Condition 2 provided, "[n]o dredging will be allowed from March 1 until May 31 of each year between River Miles 120—125 and 259—274.0 to protect fish spawning." Compl. Ex. A at 1. Mobley accepted the permit. Compl. ¶ 9.

Mobley sought removal of the permit restrictions in December 1998. Mr. Mobley sent a memorandum to the Corps during permit renewal discussions, contending that the limitation on his dredging operations conflicted with the company's purpose in obtaining the dredging permit. Compl. ¶ 12(a). He declared that the restriction was unnecessary because the Corps lacked scientific proof that Mobley's business so interfered with spawning as to endanger the fish population. Compl. ¶ 12(b).

Mr. Mobley noted that sufficient river levels were essential for plaintiff to obtain access to the sand and gravel it needed. Opti-

---

1. The permit authorized Mobley to "[d]redge sand and gravel from the White River for com- mercial resale" in "miles 70.0—125.0 and 230.1—274.0." Compl. Ex. A at 1.

mal yearly levels of river flow coincided with the months restricted by Special Condition 2. Compl. ¶ 11. The White River is accessible only between January and May, so this gave plaintiff two months to conduct its dredging. Mobley Aff., Mar. 28, 2005 ¶ 4. Mobley's inability to supply sand and gravel for construction and for other commercial endeavors caused it to lose profits. Plaintiff discontinued its White River operations in 2000. Mobley Aff. ¶ 6.

The Corps of Engineers considered Mobley's concerns but ultimately issued plaintiff's new permit with the same restrictions. Mobley appealed the restrictions through the Corps of Engineers' process, and the Corps issued a final administrative ruling denying plaintiff's appeal in 2003.[2] Compl. ¶ 13. Mobley accepted the renewal permit containing Special Condition 2 in February 2004. Compl. ¶ 15.

## DISCUSSION

The Government argues the alleged taking occurred in November 1995, when the appropriate official of the Corps of Engineers issued the permit with the condition that Mobley complains of.[3] Special Condition 2 was a partial denial of plaintiff's 1995 permit application for the right to dredge ninety-nine miles of riverbed. This would have given rise to Mobley's regulatory takings claim, according to defendant. Mobley did not appeal the denial in 1995, but expressed concerns later that the restrictions on dredging were causing economic hardship for the company.

Plaintiff disputes defendant's argument that its suit is untimely. It suggests later times for accrual of the taking. The best date for the taking is August 2003, Mobley contends, because the Corps denied its appeal then. Plaintiff relies on *Dickinson* and similar cases to argue that its takings claim did not accrue until a continuing physical process had stabilized. *United States v. Dickinson,* 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). Plaintiff contends the events leading to its taking claim did not "stabilize" until August 2003, because that is when the Corps finally denied plaintiff's appeal. Other dates that plaintiff proposes for the taking are October 2000, when the company ceased operations on the White River, or February 1999, when Mr. Mobley sent a memorandum to the Corps expressing concern about the permit's economic impact on his company.

Plaintiff argues that if the court finds the accrual date coincided with issuance of the 1995 permit, we should equitably toll the statute of limitations. Mobley asserts that it reasonably could not have known the economic consequences of Special Condition 2 until 1999 at the earliest. Defendant disputes Mobley's argument that this case presents a *Dickinson* situation, or that plaintiff could not have known of the alleged taking earlier than December 1998.

### Claim Accrual

Takings cases brought in this court are subject to a six-year statute of limitations. *See* 28 U.S.C. § 2501 ("[E]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). Congress' limited waiver of sovereign immunity for claims against the Government requires that the court adhere strictly to the statute. *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir.1988). The statute of limitations is jurisdictional in this court. *Hopland,* 855 F.2d at 1577. The party asserting jurisdiction carries the burden of establishing its existence by a preponderance of the evidence. *Reynolds v. Army*

**2.** The Corps published a final decision in November 2003. Compl. ¶ 14. Mobley appealed the Corps' denial to the United States District Court for the Eastern District of Arkansas. *See Mobley Constr. Co. v. U.S. Army Corps. of Eng'rs,* Case No. 4–03–CV–0001012 (E.D. Ark. filed Dec. 23, 2003). The district court remanded the case to the Corps for further development of the administrative record. Compl. Ex. C(6). That case is pending.

**3.** Plaintiff filed its lawsuit in this court in December 2004. The claim could not have accrued earlier than December 1998 for Mobley to have avoided the bar of the statute of limitations.

*& Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988).

■ A taking action accrues when all events necessary to fix the Government's alleged liability have occurred and the plaintiff knew or should have been known of their existence. *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed.Cir.1994); *Alaska v. United States*, 32 Fed.Cl. 689, 698 (1995). Permit denial normally is final agency action for a regulatory taking. *See Cooley v. United States*, 324 F.3d 1297, 1302 (Fed.Cir.2003) ("[A] takings claim based on a [Section] 404 permit denial must spring from a final decision."); *see also Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1038 (Fed.Cir.1997) (stating that a final decision regarding an application occurs when denial comes from "the government entity charged with implementing the regulations") (citations omitted).

■ Defendant maintains that all events fixing the Government's alleged liability for the taking occurred by November 1995 when the Corps denied plaintiff's application to use all ninety-nine miles of the White River for dredging. Plaintiff had to file suit in this court no later than November 2001 to come within the statute of limitations for the alleged taking. Plaintiff filed its Complaint more than three years later, in December 2004. Plaintiff disputes that the claim accrued upon the Corps' issuing the permit. The issuance in 1995 began a series of events leading up to the takings claim, but plaintiff asserts that Mobley was unaware of the economic consequences of the restricted permit then.

The district engineer for the Corps issued the 1995 permit. The district engineer was the appropriate official to act on plaintiff's permit application in this case; that decision was the final agency action. The Code of Federal Regulations provides that if the district engineer denies the permit or places conditions on it, "[f]inal action on the permit application is the signature on the letter notifying the applicant of the denial of the permit or signature of the issuing official on the authorizing document." 33 C.F.R. §§ 325.2(a)(1)-(7).[4] Plaintiff did not appeal the district engineer's final agency action. "A district engineer's decision on ... a permit denial ... is subject to an administrative appeal by the affected party .... Such administrative appeal must meet the criteria in 33 C.F.R. § 331.5; otherwise, no administrative appeal of that decision is allowed." 33 C.F.R. § 320.1(a)(2). The section referred to includes the following criteria:

(b) Actions not appealable. An action or decision is not subject to an administrative appeal under this part if it falls into one or more of the following categories:

(1) An individual permit decision (*including ... a standard permit with special conditions*), where the permit has been accepted and signed by the permittee. By signing the permit, the applicant waives all rights to appeal the terms and conditions of the permit ....

33 C.F.R. § 331.5 (emphasis added).

Mobley explains that it accepted the 1995 permit with Special Condition 2 because it had no way of knowing initially what the economic ramifications would be. It had

---

**4.** (1) When an application for a permit is received the *district engineer* shall immediately assign it a number for identification, acknowledge receipt thereof, and advise the applicant of the number assigned to it. He shall review the application for completeness, and if the application is incomplete, request from the applicant within 15 days of receipt of the application any additional information necessary for further processing.

(2) Within 15 days of receipt of an application the *district engineer* will either determine that the application is complete ... or that it is incomplete and notify the applicant of the information necessary for a complete application....

....

(7) If the final decision is to deny the permit, the applicant will be advised in writing of the reason(s) for denial. If the final decision is to issue the permit and a standard individual permit form will be used, the issuing official will forward the permit to the applicant for signature accepting the conditions of the permit. The permit is not valid until signed by the issuing official. Letters of permission require only the signature of the issuing official. *Final action on the permit application is the signature on the letter notifying the applicant of the denial of the permit or signature of the issuing official on the authorizing document.*

33 C.F.R. §§ 325.2(a)(1)-(7) (emphasis added).

hoped to continue operations despite the Condition. Plaintiff first learned of the restriction's adverse economic consequences to its operations in early 1999 when Mr. Mobley reviewed the company's financial data. Plaintiff argues that its claim did not accrue until the extent of its damages became known.

However, Mobley had known that rain levels made the White River accessible only between mid-January and May. When the Corps imposed the Special Condition, Mobley should have realized that dredging opportunities on the river would decrease. Precipitation had declined over the ten to fifteen years prior to issuance of the restricted permit. No substantial changes in precipitation levels occurred between 1995 and 1999. Mobley's agreeing to accept the restricted permit clearly was a risk. Perhaps Mr. Mobley could not have known the full extent of risk immediately upon having received the permit, but he should have known that some harm to his business would occur. If Mobley did not know of all the economic ramifications of the Condition at the time it was imposed, or even by December 1998, it had notice that there would be some adverse effect. Accrual of a claim need not be delayed until plaintiff can measure its damages with precision. *See Jones v. United States*, 9 Cl.Ct. 292, 295 (1985) ("Plaintiffs invariably bring lawsuits without knowing for sure what, if anything, they will recover."). The law does not permit Mobley to wait until some later time to sue, until the full extent of the damages are manifest or perhaps plaintiff feels "certain he can prevail on the merits." *Cristina Inv. Corp. v. United States*, 40 Fed.Cl. 571, 576 (1998) (quoting *Alaska*, 32 Fed.Cl. at 701).

### *Dickinson* Doctrine

█ Plaintiff advocates extending the accrual date for the statute of limitations based on the *Dickinson* Stabilization Doctrine. *See Dickinson*, 331 U.S. at 749, 67 S.Ct. 1382 (delaying accrual of a claim until the physical situation is stabilized, where the alleged taking results from a gradual physical process). The Court in *Dickinson* noted that Fifth Amendment rights are based on fairness and not "technical rule[s] of procedure," thereby discouraging the strict application of accrual principles. *Id.* at 748, 67 S.Ct. 1382. However, the Supreme Court subsequently restricted its ruling in *Dickinson*. *See United States v. Dow*, 357 U.S. 17, 27, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (holding "[t]he expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated for public use"). *Dickinson* generally has been confined to physical takings cases. *See, e.g., Boling v. United States*, 220 F.3d 1365, 1371–73 (Fed.Cir.2000) (noting that *Dickinson* applies where the Government effected a taking through a "gradual physical process, rather than utilizing the traditional condemnation procedure ... [and] that *Dickinson* stands for the proposition that the filing of a lawsuit can be postponed until the full extent of the damage is known has been soundly rejected"); *accord Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed.Cir.1998); *Fallini v. United States*, 56 F.3d 1378, 1381–82 (Fed.Cir.1995).

Plaintiff argues that its case presents a regulatory taking because of the permit denial in 1995 *and* a physical taking because "physical events impacted Mobley's operation on the White [River], in particular the effect of lack of rainfall and the river flows ...." Mobley argues that it could not have known how Special Condition 2 would affect its business until these physical events "improved or stabilized," citing *Dickinson*, 331 U.S. at 749, 67 S.Ct. 1382. Plaintiff contends that the only reliable source of quality sand and gravel turned out to be in the zone excluded by the Special Condition on its permit and other "physical events" impacting its dredging activities. These were the lack of rainfall and low water flows described above. This created a taking that was partly physical, according to Mobley, in seeking to identify a later date of "stabilization."

Plaintiff alternatively claims "stabilization" did not occur until February of 1999 when Mr. Mobley went through the company records. After years of operating under the restricted permit, Mr. Mobley assessed its financial impact on his business, which had

been gradual. Plaintiff seeks support from *Fallini*, 56 F.3d at 1378; *John R. Sand & Gravel Co. v. United States*, 57 Fed.Cl. 182 (2003); and *Walker v. United States*, 66 Fed. Cl. 57 (2005).

The court in *Fallini* noted that *Dickinson* had never been interpreted by any court so broadly as the plaintiffs were attempting to argue. 56 F.3d at 1381. *Fallini* relied in part on *Kabua v. United States*, 212 Ct.Cl. 160, 546 F.2d 381 (1976), a case that discussed the meaning of stabilization within the context of takings cases. *Kabua* noted that *United States v. Dow* "more or less limited *[Dickinson]* to the class of flooding cases where it belonged ...." 546 F.2d at 384 (citations omitted). *Fallini* also ruled that an alleged taking "stabilizes" as contemplated by *Dickinson* when something occurs that has the legal effect of triggering for the first time plaintiff's obligation to sue the Government. 56 F.3d at 1382. Nothing occurred to Mobley after denial of the full permit in 1995, except perhaps realization of the economic hardship that could result. This should have occurred near the time that the Corps issued the restricted permit.

*John R. Sand* was a physical takings case. 57 Fed.Cl. at 182. Plaintiff's claim for Just Compensation accrued when the Environmental Protection Agency issued an administrative order that required Sand to cease mining operations on portions of leased land. The Government permanently and physically took plaintiff's property. *Id.* at 183–85. Mobley's restricted 1995 permit was a regulatory action, but plaintiff suggests that physical events also affected plaintiff's operations. Defendant did not control physical events that affected Mobley, such as lack of rainfall and river levels. This was not a case in which a gradual physical process became stabilized years after the initial event.

*Walker v. United States*, 66 Fed.Cl. at 57, involved the Government's denial of a grazing permit and plaintiffs' resulting takings claim. Mobley cites it here because the Walkers made a *Dickinson* argument in a context outside the normal physical taking resulting from flooding or erosion. *Id.* at 64–65. Plaintiffs' takings claim in *Walker* sur-

vived a motion to dismiss on statute of limitations grounds. *Id.* at 67.

The Government had brought a trespass claim against the Walkers in district court, requesting damages for plaintiffs' having continued to graze on government property after cancellation of their permit. *Id.* at 60–61. The Walkers counterclaimed. *Id.* Then, in the takings action, the Walkers argued

> that the situation did not stabilize and their property was not clearly and permanently taken until after the United States District Court issued ... Final Judgment because they continued to graze ... on the *allotments* .... Therefore, the Walkers' Just Compensation claim did not arise until the date that they were physically deprived of access to their property.

*Walker*, 66 Fed.Cl. at 65. Mobley did not assert property rights in the river bed during the three months affected by the restrictions. They did not continue to work in restricted segments of the river during those months in violation of Special Condition 2. *Walker* is an unusual case that is so dissimilar on its facts that it is of little use to plaintiff here.

### Tolling the Statute

█ Plaintiff filed its takings claim about three years late. Mobley therefore must show that the circumstances of its case permit the court to toll the statute of limitations. Otherwise, we cannot hear the claim on the merits. Tolling could be justified if plaintiff were misled or misinformed by the Government, or if the facts giving rise to its claim were inherently unknowable. *Hopland*, 855 F.2d at 1577–78. These exceptions are narrow, however, and to be "strictly construed." *Id.* Plaintiff does not allege that the Government withheld information that would have permitted Mobley to file its claim earlier; we must find that facts underlying plaintiff's claim were inherently unknowable. "Ignorance of rights which should be known" will not toll the statute of limitations. *Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564, 1571 (Fed.Cir.1993) (citations omitted); *see also Cent. Pines Land Co. v. United States*, 61 Fed.Cl. 527, 534 (2004) ("That which is inherently unknowable is that which is unknowable by its

very essence, *i.e.*, its existence at the critical moment simply cannot be ascertained.") (quoting *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 407 (1994)).

■ Plaintiff argues that Mobley could not have known in 1995 that the limitation on dredging would affect its business, citing *Central Pines*, 61 Fed.Cl. at 534.[5] *Central Pines* held that the statute of limitations will be tolled when "a claimant can prove that it did not have a sufficient opportunity to discover the facts giving rise to its claim on the accrual date." *Id.* Mobley asserts that it meets the burden in *Central Pines* because "it did not have sufficient opportunity to discover the facts giving rise to its claim" until it operated under the restricted permit for several years.

*Central Pines* does not help plaintiff given the facts of this case. *Central Pines* held that the deciding court "must apply an objective standard" to determine whether a claim was knowable. 61 Fed.Cl. at 534; *see also Fallini*, 56 F.3d at 1380 (noting that actual knowledge of the harm is not necessary for the action to accrue). "[I]t is not enough for a plaintiff to show that its claim was not obvious or would have been difficult or inconvenient to discover at the time of accrual." *Cent. Pines*, 61 Fed.Cl. at 534. *Central Pines* confirms that "the court must focus on the claimant's access to the facts rather than the claimant's actual knowledge of the facts giving rise to its claim." *Id.* (citing *Catellus*, 31 Fed.Cl. at 408 and *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720–21 (Fed.Cir.1984)). "[T]he statute of limitations will not be tolled where a claimant could have asserted a claim if it had sought advice, launched an inquiry, or otherwise tak-

en steps to discover available information." *Cent. Pines*, 61 Fed.Cl. at 534.

The likelihood of plaintiff's having economic damages from the restricted permit in 1995 was not "inherently unknowable" then or during the years leading up to 1998. The record contains a letter dated December 7, 1998, from President Bryce Mobley to the Chief of the Arkansas Fish and Game Commission that said the dredging restriction had resulted in *longstanding and severe economic hardship*. A letter from Mr. Mobley to the Corps of Engineers in September 1999 complained that the dredging restriction was an *economic hardship from its inception*. He wrote that the exclusions have *"plagued us for 5 years."* Another letter from Mr. Mobley suggested that plaintiff *anticipated that the [Special] Condition would be problematic when the 1995 permit was first issued.*

The accrual date for plaintiff's takings claim corresponds with the Corps' issuance of the 1995 restricted permit and there is no reason to toll the statute of limitations. *Central Pines* held that the standard for accrual is objective. Plaintiff has not explained why it could not have "launched an inquiry, or otherwise taken steps to discover available information" earlier, or why it could not have filed a takings claim then. Mobley has taken an alternative route through the administrative process with the Corps and in the district court through an Administrative Procedure Act claim. *See* 5 U.S.C. § 702. Its second-track effort was attempting to remove Special Condition 2 from permit renewals, rather than seeking compensation for an alleged taking that would have occurred in 1995. Conduct of the administrative appeals does not permit revival of the 1995 claim in this court.

---

5. Plaintiff cites for support the following excerpts from a June 10, 2005 affidavit of its president, Mr. Bryce Mobley:

The company accepted the condition but was unaware of the economic ramifications that the condition would have on its business because this information was not knowable at the time the 1995 Permit was issued. Aff. 2 ¶ 5.

It was not until early 1999 that Mobley became aware of the disastrous economic effects that the condition would have on its business. Aff. 2 ¶ 6.

While Mobley accepted the condition in 1995, which it believed was a temporary condition,

such acceptance did not mean that Mobley was aware of the consequences that [Special Condition 2] would have on its White River dredging operations. Aff. 2 ¶¶ 2–3.

It was not until after Mobley had operated under the restriction for several years that it was able to ascertain the result and review its financial information in light of the effect of [Special Condition 2] on the business. It was not until 1999 that the company was able to correlate a causal connection between [Special Condition 2] and the natural conditions, i.e., the weather, precipitation events, and river flows. Aff. 2 ¶¶ 5–6.

### The Administrative Process

Plaintiffs engaged in the Administrative Procedure Act process in an effort to reverse the Corps' decision denying plaintiff the full use of the river for dredging. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). The takings claim discussed above seeks damages for the Corps' having denied Mobley an unrestricted permit in 1995. Plaintiff has moved on different fronts with entirely different goals. An excellent analysis of this concept and related issues may be found in *Cristina Investment Corp.*, 40 Fed.Cl. at 578:

> A property owner aggrieved by a federal government permit denial has two distinct avenues of judicial recourse available. That owner may bring a claim in district court challenging the denial on its merits. By such a claim, a property owner seeks reversal of the denial, and ultimately the right to engage in the proscribed use. Alternatively, that owner may bring a takings claim here, seeking not reversal of the permit denial, but rather compensation for it.

For Mobley to have jurisdiction in the district court it must have exhausted the administrative appeals process with the agency. The jurisdictional question before us is whether Mobley timely filed its takings claim. The administrative review now being sought by plaintiff in federal district court and the takings claim filed with us are separate matters; one disputes the terms of the permit and the other impliedly accepts them. Plaintiff's participation in the administrative process has had no bearing on the time that its right to sue in this court first accrued. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (ruling that "challenges to a government denial are different in kind from a takings claim, and do not bear upon whether the takings claim is ripe for adjudication").

The Federal Circuit has ruled that where a plaintiff makes a "conscious choice" to pursue an administrative remedy, this decision militates against tolling the statute of limitations on a takings claim based on the same event. *Creppel v. United States*, 41 F.3d 627, 633 (Fed.Cir.1994). The Circuit explained, "[o]therwise, claimants would be able to file the in Court of Federal Claims as an afterthought, once their challenge in the district court was resolved. Requiring that suits be filed contemporaneously ... better insures the claimants' good faith and rewards the diligent prosecution of grievances." *Id.*

### CONCLUSION

The case before this court is a regulatory takings claim based on the Corps of Engineers' restriction on dredging twenty miles of the White River for three months each year. A takings claim accrues when all events have occurred to fix the Government's alleged liability. The property owner was aware of these events in November 1995 or soon thereafter. If Mobley would say that it did not know the *effect* of the restrictions until much later, such knowledge nevertheless would be imputed to the company according to the objective standard explained in *Central Pines*, 61 Fed.Cl. at 534.

"There is a critical difference between knowing of a potential claim and being certain that one will prevail on the merits at trial. The former, and not the latter, is sufficient to start the running of the statute of limitations." *Alaska*, 32 Fed.Cl. at 701. Plaintiff's takings claim ripened in 1995 and its cause of action accrued then. We cannot hear this case on the merits because the statute of limitations expired in 2001. Mobley filed suit three years later in 2004.

Defendant's Motion to Dismiss for lack of jurisdiction is GRANTED. The Clerk of Court will enter judgment dismissing Plaintiff's Complaint. No costs.