DEVON ENERGY CORP., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–665L.

United States Court of Federal Claims.

Dec. 21, 1999.

Harold L. Hensley, Jr., Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P., Roswell, NM, for plaintiff, with whom were J. Harrell Feldt, Vinson & Elkins, L.L.P., Houston, TX, Rod M. Schumacher, Atwood, Malone, Turner & Sabin, Roswell, NM, and James M. Hudson and Karolyn King Nelson, Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P., Roswell, NM, of counsel.

Thornton Withers Field, Environment and Natural Resources Div., Dept. of Justice, Washington, DC, for defendant, with whom was Grant L. Vaughn, Office of the Field Solicitor, Dept. of the Interior, Sante Fe, NM, of counsel.

## OPINION

MARGOLIS, Judge.

This is a regulatory taking and breach of contract case concerning three federal oil and gas leases. Plaintiffs, all of whom possess ownership interests in at least one of the federal leases at issue, allege that the government's denial of certain drilling permits on the leases constitutes an illegal taking of plaintiffs' property under the Fifth Amendment and a breach of the lease contracts. The case is currently before the court on the government's opposition to the filing of plaintiffs' first amended complaint and the government's motion to dismiss. The government contends that the first amended complaint should be struck or not be filed because it was filed without leave of the court. In its motion to dismiss, the government argues that plaintiffs' Fifth Amendment takings claim is not ripe because plaintiffs failed to exhaust administrative appeals or seek alternative drilling operations after their applications for permits to drill were denied. The government additionally argues that plaintiffs lack the requisite property interests and privity of contract to bring their claims.

After careful consideration of the parties' written and oral arguments, the court concludes for the reasons set forth below that plaintiffs' first amended complaint was properly filed without leave of the court, that plaintiffs' takings claim is ripe for review, and that plaintiffs possess the requisite property interests to bring their takings claim. The court further finds that plaintiffs under two of the three leases at issue possess the necessary privity of contract to assert breach of contract claims, and the court temporarily stays the government's motion to dismiss plaintiffs' breach of contract claim under the third lease pending the possible joinder of an additional party. Accordingly, plaintiffs' fil-

ing of their first amended complaint is granted, and the government's motion to dismiss is denied in part and stayed in part.

## BACKGROUND

This case concerns three federal oil and gas leases—NMNM–0404441 ("Lease '4441"), NMNM–0405444 ("Lease '5444"), and Lease NMNM–05444A ("Lease '5444A") (collectively referred to as the "Subject Leases")— issued in 1963 by defendant, the United States, acting through the Bureau of Land Management ("BLM"). The Subject Leases cover approximately 4,000 acres of federal land in New Mexico, and were issued pursuant to the Mineral Leasing Act ("MLA"), 30 U.S.C. § 226 et seq., which sought to promote the orderly development of oil and gas deposits in publicly owned lands of the United States. See Harvey v. Udall, 384 F.2d 883, 885 (10th Cir.1967). Consistent with the MLA, the leases granted the record title holder of the leases:

> the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas, except helium, in the lands leased, together with the right to construct and maintain thereupon ... structures necessary to the full enjoyment thereof, for a period of 10 years, and so long thereafter as oil or gas is produced in paying quantities ....

Subject Leases § 1.

Marathon Oil Company,[1] is the current record title holder of Leases '4441 and '5444A. Mobil Exploration & Producing U.S., Inc. ("Mobil"), which is not a party to the instant lawsuit, holds record title to Lease '5444. Record title is "[a] lessee's interest in a lease which includes the obligation to pay rent, and the rights to assign and relinquish the lease." 43 C.F.R. § 3100.0–5(c) (1988). Plaintiffs each own operating rights and/or overriding royalty interests in one or more of the Subject Leases. An operating right is "the interest created out of a lease authorizing the holder of that right to enter upon the leased lands to conduct drilling and related operations, including production of oil or gas from such lands."

---

**1.** Plaintiffs' first amended complaint seeks to add Marathon Oil as a party to this suit.

*Id.* § 3100.0–5(d). An overriding royalty is an interest carved out of operating rights that grants a royalty on minerals as they are produced, or the value thereof, free of the costs of production.

Pursuant to regulation, plaintiffs are required to obtain BLM approval prior to drilling for oil or gas on the Subject Leases. *See* 30 C.F.R. § 221.21(b) (1959) ("The lessee shall not begin to drill ... without first notifying the supervisor of his plan and intention and receiving written approval prior to commencing the contemplated work ...."); *accord* 43 C.F.R. § 3162.3–1(c) (1997). Plaintiff Devon Energy Corp. ("Devon"), as the designated operator of the Subject Leases, sought to develop a large number of shallow oils wells on the Subject Leases in the early 1990s. From April 1992 to July 1997, however, BLM denied 21 Applications for Permit to Drill (APDs) filed by Devon on the grounds that the proposed wells would interfere with potash mining, unduly waste potash resources, and jeopardize the health and safety of potash miners.[2]

*I. The Potash Area and the Potash Order*

The Subject Leases are located in the Secretary of the Interior's "Potash Area," as defined in the Secretary's 1975 and 1986 Potash Orders. *See* 40 Fed.Reg. 51486 (Nov. 5, 1975) ("1975 Potash Order"); 51 Fed.Reg. 39425 (Oct. 28, 1986) ("1986 Potash Order"). The Potash Area was originally established when the Secretary of the Interior, acting under authority of the MLA, issued the 1939 Potash Order placing under protection 42,000 acres of federal land containing potash. *See* 4 Fed.Reg. 1012 (Feb. 6, 1939). The parties agree that the Subject Leases fell outside of the boundaries of the Potash Area as it existed when the leases were issued in 1963. In 1975, however, the Secretary of the Interior expanded the Potash Area to encompass, for the first time, much of the land contained in the Subject Leases. *See* 1975 Potash Order § V. The 1975 Potash Order was revised, without substantive change, in 1986, and the BLM currently operates under its interpretation of the 1986 Potash Order. *See* 1986 Potash Order § II.

In an effort to balance multiple mineral development within the Potash Area, the 1986 Potash Order provides, "It is the policy of the Department of the Interior to deny approval of most applications for permits to drill oil and gas test wells from surface locations within the potash enclaves...." *Id.* § III.E.1. The Potash Order defines potash enclaves as "those areas ... where potash ore is known to exist in sufficient thickness and quality to be mineable under existing technology and economics." *Id.* § III.D.1.c. The Potash Order provides two exceptions to the general policy of denying permit applications in the potash enclaves:

a. Drilling of vertical or directional holes shall be allowed from barren areas within the potash enclaves when ... such operations will not adversely affect active or planned mining operations in the immediate vicinity of the proposed drillsite;

b. Drilling of vertical or directional holes shall be permitted from a drilling island located within a potash enclave when ... there are no barren areas within the enclave or drilling is not permitted on the established barren area(s) within the enclave because of interference with mining operations [or the target oil or gas formations are not otherwise accessible].

*Id.* § III.E.1.a, b.

As a condition to the issuance of any federal oil and gas lease in the Potash Area, the 1986 Potash Order requires that the lessee append a series of stipulations (the "potash stipulations") to the lease further defining the situations in which drilling may not occur. *See* 1986 Potash Order § III. A. Specifically, the potash stipulations state that any oil or gas development under the lease (1) "will not interfere with the mining and recovery of potash deposits," (2) will not "result in undue waste of potash deposits or constitute a hazard to or unduly interfere with mining operations being conducted for the extraction of potash deposits," and (3) will be conducted so as to "prevent the infiltration of oil, gas or water into formations containing potash deposits or into mines or workings being utilized in the extraction of such deposits." *Id.*

**2.** Potash is a mixture of potassium and associated minerals.

§ III.A.1, 2, 4. The Potash Order further provides that "[i]n taking any action under [the potash stipulations] of this Order, the authorized officer shall take into consideration the applicable rules and regulations of the Oil Conservation Division of the State of New Mexico." 1986 Potash Order § III.A.4. This provision of the Potash Order enables BLM to consult the projected mining plans of potash mining companies, filed under state rules and regulations, in adjudicating APDs. Consequently, the general prohibition on oil development in the potash enclaves extends also to areas to be mined for potash, called Life of Mine Reserves ("LMR") areas. It appears that BLM also imposes a no drilling "buffer zone" of one-quarter to one-half mile outside the potash enclaves and LMR areas. *See* 1986 Potash Order § III.E.2; Gray Affidavit, ¶ 7.

The Secretary of the Interior contemplated that leases located outside of the Potash Area when issued were not governed by the Potash Order and were not required to adopt the potash stipulations. However, the 1975 Potash Order provided a mechanism whereby owners of existing oil and gas leases could, at their discretion, elect to subject leases to the Potash Order, nonetheless: "The lessee of any existing lease in the designated Potash Area may make such land subject to the [Potash Order] by filing an election to do so." *Id.* § IV. BLM concedes that plaintiffs never elected to subject the Subject Leases to the Potash Order.

## II. Standards for Evaluating Oil and Gas Development on the Subject Leases

The standards to be used by BLM in evaluating APDs are contained in the relevant leases, and applicable statutes and regulations. The Subject Leases in this case require plaintiffs:

> To exercise reasonable diligence in drilling and producing the wells herein provided for ..., having due regard for the prevention of waste of oil or gas or damage to deposits or formations containing oil, gas or water or to coal measures or other mineral deposits, for conservation of gas energy, for the preservation and conservation of the property for future productive

operations, and for the health and safety of workmen and employees.

Subject Leases, § 2(j). The Subject Leases further provide that they are subject "to the terms and provisions of the [Mineral Leasing Act] and to all reasonable regulations of the Secretary of the Interior now or hereafter in force, when not inconsistent with any express and specific provisions herein, which are made a part hereof." Subject Leases at 1. Similarly, section 4 of the Subject Leases provides:

> Drilling and Producing Restrictions: It is agreed that the rate of prospecting and developing and the quantity and rate of production from the lands covered by this lease shall be subject to control in the public interest by the Secretary of the Interior, and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, and regulations issued thereunder....

Subject Leases, § 4.

Like the provisions in the Subject Leases themselves, the regulations in force at the time the Subject Leases were issued provide that:

> The lessee shall comply with the terms of the lease, and of the regulations in this part and any amendments thereof, ... shall take all reasonable precautions to prevent waste, damage to formations or deposits containing oil, gas, or water or to coal measures or other mineral deposits, and injury to life or property....

30 C.F.R. § 221.18 (1959) (promulgated by the U.S. Geological Survey, which regulated oil and gas operations at the time the Subject Leases were issued). The current regulations similarly provide BLM with authority to require that all operations under the Subject Leases be conducted in a manner that protects natural resources and the environmental quality and prevents undue damage to subsurface resources. *See* 43 C.F.R. §§ 3161.2, 3162.5–1(a)–(b) (1997). The regulations also provide that use of leased land is subject to:

> such reasonable measures as may be required by the authorized officer to mini-

mize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed. To the extent consistent with lease rights granted, such reasonable measures may include, but are not limited to, modification to siting or design of facilities, [and] timing of operations. . . .

43 C.F.R. § 3101.1–2 (1997).

*III. BLM's Evaluation of Plaintiffs' Applications for Permits to Drill*

Between April 29, 1992 and February 12, 1996, Devon, acting as the designated operator for plaintiffs, submitted to BLM 15 APDs for various drilling units on the Subject Leases. BLM denied the 15 APDs. Devon appealed the denials to the Interior Board of Land Appeals ("IBLA"). The IBLA then referred the cases to an Administrative Law Judge for a hearing and final departmental decision. *See Yates Petroleum Corp. et al.*, 131 IBLA 230, 235–36 (1994). By order dated June 28, 1996, the Administrative Law Judge remanded the permit denials to the BLM, directing BLM to reconsider the denials in light of, among other things, Devon's arguments that BLM had improperly subjected the Subject Leases to the Potash Order and treated the Subject Leases as if they contained the potash stipulations.

On remand, BLM again denied the 15 APDs. *See* BLM Decision Letters of Sept. 3, 1996, Sept. 5, 1996, Oct. 9, 1996, and Oct. 10, 1996 at 1. In denying the APDs on remand, BLM acknowledged that the Subject Leases were issued prior to the expansion of the Potash Area in 1975 and therefore were not required to contain the potash stipulations. *Id.* BLM further acknowledged that the lessees had never elected to subject the Subject Leases to the potash stipulations or Potash Order through the Potash Order's voluntary election of coverage mechanism. *Id.* BLM took the position, however, that it was appropriate to apply the Potash Order principles to plaintiffs' APDs under BLM's broader statutory, regulatory, and contractual authority to resolve mineral conflicts and prevent the waste of resources. BLM held that:

the Lease Agreement itself subjects the lessee to all reasonable regulations of the Secretary of the Interior from the time of issuance and into the future. Furthermore, the Lease Agreement specifies that lease operations would not negatively impact formations or other mineral deposits, nor the health and safety of workmen and employees. These tenants are consistent with the 1986 Secretary's [Potash] Order which provides for the safety of underground workers and prevents waste of potash.

*Id.* After consulting LMR submittals and determining that potash mining was likely to take place in the areas of the proposed oil wells, BLM concluded that "[d]rilling at the proposed location would likely interfere with future potash mining and result in undue waste of known enclave [potash] reserves. Also, in the future, it could prove hazardous to the health and safety of potash miners." *Id.* at 2. Devon did not appeal the APD denials to the IBLA.

In addition to these 15 APDs, Devon also filed on behalf of plaintiffs five APDs on other drilling units in the Subject Leases on December 13 and 20, 1993. The group of five APDs was originally approved for a term of one year and was later extended for an additional year. BLM denied a second extension request on July 23, 1996, however, and explained that given new LMR submittals, "[d]rilling at the proposed location would likely interfere with future potash mining and result in undue waste of potash. In the future, it could also prove hazardous to the health and safety of potash miners." *See* BLM Decision Letters of July 23, 1996. Devon did not exercise its appeal rights to the IBLA. Finally, Devon also filed a single APD for the Barclay "11K" Federal No. 11 well, which BLM denied on July 15, 1997. BLM held that the proposed well was located in the potash enclave created by the Potash Order and would likely interfere with future mining, result in undue waste of potash, and pose a safety hazard to potash miners. *See* BLM Decision Letter of July 15, 1997. Devon did not appeal this APD denial to the IBLA.

## DISCUSSION

Plaintiffs filed the instant action on August 19, 1998, alleging that (1) BLM's denial of

the APDs constitutes a compensable taking of the oil and gas underlying the APDs, and (2) BLM's denial of the APDs constitutes a material breach of the three Subject Leases. Plaintiffs contend that BLM's application of the Potash Order in adjudicating the APDs breached the terms of the Subject Leases, depriving plaintiffs of the complete use and enjoyment of their property and denying plaintiffs their reasonable investment-backed expectations from oil and gas production. The government filed its motion to dismiss pursuant to RCFC 12 on the grounds of ripeness, standing, and privity. Thereafter, on January 11, 1999, plaintiffs filed their first amended complaint adding Marathon Oil as a plaintiff, adding an additional claim for the taking of the oil and gas underlying the remaining spacing units in the Potash and LMR Areas, and making various other modifications to the complaint. The government filed its opposition to plaintiffs' amended complaint. The court addresses in turn the government's opposition to plaintiffs' filing of the first amended complaint and the government's motion to dismiss.

*I. Plaintiffs' Amended Complaint*

The first issue before the court is whether plaintiffs may amend their complaint as a matter of right, and if not, whether the court should grant plaintiffs leave to amend their complaint. Plaintiffs contend that they are entitled to amend their complaint as a matter of right under Rule 15(a) of the Rules of the United States Court of Federal Claims ("RCFC") because they have not previously amended the complaint, and the government has not yet filed an answer. Alternatively, plaintiffs argue that the court should grant plaintiffs leave to amend the complaint. The government opposes plaintiffs' attempt to amend the complaint, arguing that the new allegations are totally unsupported and have been raised to defeat by allegation the government's previously filed motion to dismiss.

RCFC 15(a) provides that:

[a] party may amend the party's own pleadings once as a matter of course at any time before a response is served.... Otherwise a party may amend the party's own pleading only by leave of court or by writ-

ten consent of the adverse party; and leave shall be freely given when justice so requires.

Plaintiffs correctly point out that the government has yet to file an answer to the complaint. In lieu of filing an answer, however, the government filed its motion to dismiss on December 4, 1998—several weeks prior to the filing of plaintiffs' first amended complaint on January 11, 1999. The court, therefore, must decide if the government's motion to dismiss constitutes a "response" to the complaint for the purposes of RCFC 15(a). If the government's motion to dismiss does not constitute a "response" within the meaning of RCFC 15(a), then plaintiffs were entitled to amend their complaint as a matter of right on January 11, 1999.

The Federal Circuit has not addressed whether a motion to dismiss constitutes a "response" for purposes of RCFC 15(a). Several circuit courts, however, have considered a similar question under Rule 15(a) of the Federal Rules of Civil Procedure ("Fed. R.Civ.P."), on which RCFC 15(a) is patterned. Fed.R.Civ.P. 15(a) provides that "[a] party may amend the party's pleading once as a matter of course at any time before a *responsive pleading* is served." Fed. R.Civ.P. 15(a) (emphasis added). Courts addressing this question in the Federal Rules context have held that a motion to dismiss is not a responsive pleading within the meaning of Fed.R.Civ.P. 15(a), and that a plaintiff is therefore entitled to amend its complaint notwithstanding that a motion to dismiss previously had been filed. *See, e.g., Reuber v. United States,* 750 F.2d 1039, 1062 n. 35 (D.C.Cir.1984); *McDonald v. Hall,* 579 F.2d 120, 121 (1st Cir.1978); *Domino Sugar Corp. v. Sugar Workers Local Union 392,* 10 F.3d 1064, 1068 n. 1 (4th Cir.1993); *Barksdale v. King,* 699 F.2d 744, 747 (5th Cir.1983); *Hill v. City of Indianapolis,* 17 F.3d 1016, 1018 (7th Cir.1994); *Allen v. Veterans Admin.,* 749 F.2d 1386, 1388–89 (9th Cir.1984); *Cooper v. Shumway,* 780 F.2d 27, 29 (10th Cir. 1985); *Fortner v. Thomas,* 983 F.2d 1024, 1032 (11th Cir.1993).

This court often looks to precedent under the Federal Rules of Civil Procedure where a gap exists in the case law governing

its own rules. *See, e.g., Judin v. United States,* 110 F.3d 780, 784 (Fed.Cir.1997) (relying on Federal Rules of Civil Procedure precedent when applying RCFC 11, which was patterned on Fed.R.Civ.P. 11); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989) (relying on Federal Rules of Civil Procedure precedent when applying United States Claims Court Rule 41(b), which was patterned on Fed.R.Civ.P. 41(b)). Thus, the Federal Rules precedent on Rule 15(a) is highly instructive. The court's inclination to follow the Federal Rules precedent in this case is not diminished by the fact that RCFC 15(a) refers to a "response" where the rule's counterpart under the Federal Rules of Civil Procedure refers to a "responsive pleading." The court noted once before that "[t]here is no indication that the drafters of the Claims Court rules meant anything other than 'responsive pleading' when they chose the term 'response' in their version of rule 15(a)." *Hopi Tribe v. United States,* 20 Cl. Ct. 782, 784 n. 2 (1990) (finding that any right to amend as a matter of course was terminated when the Claims Court granted the government's motion to dismiss); *see also Te–Moak Bands of Western Shoshone Indians v. United States,* 948 F.2d 1258, 1260 n. 4 (Fed.Cir.1991) (noting that Rule 15(a) of the Rules of the United States Claims Court, which is identical to RCFC 15(a), "is not materially different from Fed.R.Civ.P. 15(a)"). The court therefore holds that the government's motion to dismiss does not constitute a response for purposes of RCFC 15(a). Accordingly, plaintiffs were entitled to file their first amended complaint as a matter of course, and the court must address the amended complaint. *See Hill,* 17 F.3d at 1018 (holding that "[t]he district court necessarily had a corresponding obligation to review the Hills' Amended Complaint" because it was filed before the court granted the government's motion to dismiss the original complaint).

3. The Fifth Amendment provides, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend V.

4. Plaintiffs' first amended complaint added Marathon Oil, the record title holder of Leases '4441 and '5444A, as a plaintiff in this suit. Because the government has responded to the new allega-

## II. Government's Motion to Dismiss

The government raises three separate arguments in support of its motion to dismiss. First, the government contends that the Fifth Amendment takings claim is not ripe and should be dismissed because plaintiffs have failed to pursue alternative drilling options or administrative appeals that could overcome the BLM permit denials.[3] Second, the government argues that the Fifth Amendment takings claim should be dismissed as to those plaintiffs holding unrecorded operating rights or overriding royalty interests, as those plaintiffs lack a protected property interest in the Subject Leases. Third, the government asserts that the breach of contract claim should be dismissed for lack of privity because none of the plaintiffs named in the original complaint hold record title to the Subject Leases.[4]

### A. Ripeness of Takings Claim

To succeed on a regulatory taking claim, a plaintiff must demonstrate, among other things, that the regulation at issue has "taken" his property—that is that the regulation "goes too far." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *see MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986). In determining if a regulation goes too far, the courts engage in "essentially ad hoc, factual inquiries," *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), examining factors such as the economic impact of the regulation, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. *See MacDonald,* 477 U.S. at 349, 106 S.Ct. 2561; *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 191, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

tions raised in plaintiffs' first amended complaint, both in its opposition to the amended complaint and its response to plaintiffs' opposition to its motion to dismiss, the court finds it appropriate to consider plaintiffs' new allegations in ruling on the government's motion to dismiss.

As a result of this inquiry, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County,* 473 U.S. at 186, 105 S.Ct. 3108. That is, "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *Mac-Donald,* 477 U.S. at 348, 106 S.Ct. 2561.

### 1. Alternative Drilling Options

The government first contends that plaintiffs' refusal to seek alternative drilling options, likened to "variances" by the government, renders plaintiffs' takings claim unripe. According to the government, plaintiffs' failure to apply for (1) additional vertical or directional wells from areas barren of potash resources, and (2) directional wells adjacent to existing wells on drilling islands precludes BLM from making a clear and definitive determination of the extent to which the subject property can be drilled for oil and gas. The government stresses that drilling permits are available for the subject lands and that without further effort by plaintiffs to obtain those permits the court cannot weigh the impact of the government's conduct on plaintiffs' alleged property rights.

The government relies predominantly on *Williamson County,* 473 U.S. at 172, 105 S.Ct. 3108, and its progeny,[5] to support its argument that plaintiffs' failure to pursue alternative drilling options renders BLM's permit denials not final. In *Williamson County,* a county planning commission denied a developer's proposal to build a residential complex based on eight instances of noncompliance with various zoning regulations. 473 U.S. at 175, 181, 105 S.Ct. 3108. The developer alleged that the planning commissions' denial amounted to a taking of its property under the Fifth Amendment. *See id.* at 182, 105 S.Ct. 3108. In holding the takings claim unripe, the Supreme Court reasoned that the developer's failure to seek a variance excepting it from the zoning regulations at issue prevented the planning commission from arriving at a "conclusive determination ... whether it would allow respondent to develop the subdivision in the manner respondent proposed." *Id.* at 193, 105 S.Ct. 3108. "[U]ntil the Commission determines that no variances will be granted, it is impossible for the [fact finder] to find, on this record, whether respondent 'will be unable to derive economic benefit' from the land." *Id.* at 191, 105 S.Ct. 3108.

The government's reliance on *Williamson* is misplaced. "The problem with applying *Williamson* to this case ... is that *Williamson* involved an alleged taking by a local county zoning commission. It did not involve an alleged taking by the federal government, like the taking claim presented here." *Loveladies Harbor, Inc. v. United States,* 15 Cl. Ct. 381, 386 (1988) (holding takings claim ripe notwithstanding plaintiffs' failure to pursue "variance" after government denied permit to fill wetlands). Whereas many local zoning regulations include variance procedures as "safety valves" to prevent overly strict ordinances from becoming unconstitutional, *see id.* at 387, the federal laws and regulations at issue here include no such mechanism. The "variance" procedures that the government alleges are available, including drilling from barren areas and drilling directionally from drilling islands, differ in a material respect from true variances. A variance exempts a property owner from a zoning law or regulation, allowing the property to be developed in a manner otherwise proscribed by the law or regulation. *See id.* By contrast, the alternative drilling options suggested by the government in this case cannot exempt plaintiffs from BLM's regulatory powers or the Potash Order and Stipulations, allowing plaintiffs to develop the Subject Leases as they proposed. Just the opposite, the government's proposed alternatives are those required by the Potash Order—precisely the regulatory scheme to which plaintiffs argue they should not be subjected. Thus, unlike the situation in *Williamson,* plaintiffs have no variance procedure to pursue. *Id.* at 186, 105 S.Ct. 3108.

---

5. *See, e.g., MacDonald,* 477 U.S. at 351, 106 S.Ct. 2561.

■ Moreover, plaintiffs need not pursue the alternative drilling options suggested by the government to ripen their takings claim if such alternatives would be futile. *See Cristina Inv. Corp. v. United States*, 40 Fed. Cl. 571, 580 (1998), *appeal dismissed*, 155 F.3d 570, 1998 WL 382669 (Fed.Cir.1998); *Formanek v. United States*, 18 Cl.Ct. 785, 792–93 (1989). The futility exception is intended "to protect property owners from being required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved." *Howard W. Heck & Assocs. v. United States*, 134 F.3d 1468, 1472 (Fed.Cir.1998)(emphasis in the original). For example, in *Loveladies Harbor*, 15 Cl.Ct. at 384, the plaintiffs sought a permit to fill part of a wetland for a housing complex. The Army Corps of Engineers denied the permit application on the ground that the proposed project would destroy the wetland and its related wildlife and vegetation. *See id.* After plaintiffs brought their takings claim directly to the court, the government moved to dismiss, arguing that plaintiffs were required to first submit alternative, less ambitious proposals and at least one variance to the Corps. *See id.* at 385. The court held that because the Corps' objections to the permit application were based on environmental concerns, and any plan for development of the wetland would raise those same concerns, the Corps' denial rendered the proposed project "unacceptable per se." *Id.* at 386. Thus, the court concluded that the permit denial represented a final government decision. *Id.; see also Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1040 (Fed.Cir.1997) (finding the denial of a wetland fill permit final "because the denial was based on an unchanging fact—the inclusion of [plaintiff's] lands as part of a national park protection zone"); *Cristina*, 40 Fed.Cl. at 580 (finding denial of wetland fill permit final because "the Corps denial was based upon an unchanging fact that the wetlands at issue here were within a protected zone . . ."); *City Nat'l Bank of Miami v. United States*, 30 Fed.Cl. 715, 720 (1994).

■ The court finds that plaintiffs are not required to seek additional permit applications for alternative well locations within the Potash Area because any such applications would be futile. BLM has expressed a clear policy of applying the Potash Order and Stipulations to the Subject Leases, thus bringing the subject lands within the protected zone of the Potash Area. Under the Potash Order, and consistent with BLM's denial of plaintiffs' prior APDs, any proposed wells piercing mineable potash resources would be denied. As the government concedes, potash is presumed to exist throughout the entire Potash Area, and drilling is severely restricted in the potash enclave and in MLR areas and buffer zones. Thus, any new APDs submitted by plaintiffs in this case would almost certainly share the same fate as the APDs already denied, given that the APDs would continue to be within the protected Potash Area and LMR areas and buffer zones. *See Loveladies Harbor*, 15 Cl.Ct. at 386; *Bayou Des Familles*, 130 F.3d at 1040; *Cristina*, 40 Fed.Cl. at 580; *City Nat'l Bank of Miami*, 30 Fed.Cl. at 720. Moreover, the court is mindful that the government has provided little indication of exactly what action, or number of permits, it believes would satisfy plaintiffs' alleged duty to pursue alternatives. Instead, "[d]efendant has merely suggested that plaintiffs need to file an indeterminable number of additional applications." *Formanek*, 18 Cl.Ct. at 792 (holding takings claim based on denial of wetlands fill permit to be ripe). When this broader factual context is considered, *see Buere'-Co. v. United States*, 16 Cl.Ct. 42, 50 (1988), the court is persuaded that additional applications for new well locations would be futile and need not be pursued to ripen plaintiffs' takings claim. *See Eastern Minerals Int'l, Inc. v. United States*, 36 Fed.Cl. 541, 547 (1996) (holding that permit denial on one tract of land was sufficient to ripen taking claim on four additional tracts because additional permits were futile).

Finally, "[t]he ripeness requirement should not oblige a landowner to seek a permit for a development proposal that it does not deem economically viable and, hence, does not intend to undertake." *Buere'-Co.*, 16 Cl.Ct. at 51 n. 11. Plaintiffs contend that drilling directional wells from existing surface wells located on established drilling islands would not be economically viable and they are not

required, therefore, to seek APDs based on such plans to ripen their takings claim. Plaintiffs note that none of the existing wells from which they could start the directional wells are closer than 1,000 feet from the locations proposed in plaintiffs' denied APDs. *See* Jacob Affidavit ¶ 4. Directional wells with a displacement of 1,000 feet, plaintiffs maintain, carry higher drilling costs, increased risks of not reaching the objective oil formation, and greater operating expenses. *See* O'Brien Affidavit ¶¶ 7–10. These considerations render the directional wells economically infeasible according to plaintiffs. *See* Jacob Affidavit ¶ 5; Gray Affidavit ¶ 13. The government fails to adequately rebut plaintiffs' contentions with any evidence specific to these leases, noting simply that "directional drilling is common in the industry" and has been used elsewhere in the Potash Area. Def.'s Resp. at 11. The court finds that it would be inappropriate to dismiss plaintiffs' takings claim and force plaintiffs to pursue directional drilling alternatives based on the sparse evidence presented by the government. "To the extent that the government disagrees with the landowner's conclusion as to the economic viability of development proposals left open by an agency decision, it can present its arguments to the court considering the merits of the taking claim." [6] *Buere'–Co.*, 16 Cl.Ct. at 51 n. 11.

### 2. Administrative Appeals

The government next argues that BLM's denial of plaintiffs' APDs do not constitute final decisions for purposes of plaintiffs' takings claim because plaintiffs have not attempted to overcome the permit denials by exhausting their administrative appeals. The government explains that plaintiffs "do not deny that the relief they seek—reversal of the BLM application of the Potash Order policy through regulatory means—could be

achieved by a successful appeal to the IBLA. Yet they give no reason for not exhausting that appeal to higher authority." Def.'s Resp. to Pls.' Opp. to Mot. to Dismiss at 7.

■ Contrary to the government's position, plaintiffs' decision to abandon their right of appeal to the IBLA and instead bring a takings claim in this court does not render their claim premature. In *Williamson County*, the Supreme Court distinguished between the finality requirement and the exhaustion of remedies requirement and explained that there is no duty to exhaust administrative remedies prior to bringing a takings claim. 473 U.S. at 192–93, 105 S.Ct. 3108. The Court explained that "[t]he finality requirement is concerned with whether the *initial decisionmaker* has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Id.* at 193, 105 S.Ct. 3108 (emphasis added). By contrast, "the exhaustion requirement generally refers to *administrative and judicial procedures* by which an injured party may seek *review* of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* (emphasis added). The Court then found that the variance procedure at issue in *Williamson* went to finality: "resort to the procedure for obtaining variances would result in a conclusive determination *by the Commission* whether it would allow respondent to develop the subdivision in the manner respondent proposed." *Id.* (emphasis added). However, the Court went on to expressly state that the administrative remedies available to the plaintiff, including an appeal to the Board of Zoning Appeals, would not be required to satisfy the finality requirement, because such an appeals board "was empowered, at most, *to review that rejection,* not to participate *in the Com-*

**6.** The government does not indicate whether its motion to dismiss is based on lack of jurisdiction pursuant to RCFC 12(b)(1) or failure to state a claim pursuant to RCFC 12(b)(4). Although the court has treated the government's motion as if it were a RCFC 12(b)(1) motion, and therefore reviewed certain evidence to resolve factual disputes concerning the jurisdictional question, *see Buere'–Co.*, 16 Cl.Ct. at 52, the court notes that the government's motion to dismiss for failure to state a claim under RCFC 12(b)(4) would also have been denied. In deciding a motion to dis-

miss pursuant to RCFC 12(b)(4) the court takes as true plaintiffs' factual allegations in the complaint and makes all reasonable inferences in favor of the nonmoving party. *See id.* at 49. Given that plaintiffs allege that BLM's actions prohibits the drilling of oil and gas wells in the Potash and LMR Areas and "deprived Plaintiffs of the complete use and enjoyment of their property," Amended Compl. ¶¶ 12, 16, 17, 20, 21, the government's motion to dismiss under RCFC 12(b)(4) would fail. *See Buere'–Co.*, 16 Cl.Ct. at 49.

*mission's* decisionmaking." *Id.* (emphasis added).

■ Thus, in the present case, the court must concern itself only with the decision of the "initial decisionmaker," BLM, and determine if BLM has arrived at a conclusive decision concerning the denial of plaintiffs' APDs. That a separate appellate board, the IBLA in this case, could *administratively review* BLM's decision and find that it was improper in no way impacts the issue of whether the *initial decisionmaker* came to a final definitive position. Like the Board of Zoning Appeals in *Williamson*, the IBLA can at most review BLM's denial, it cannot participate in BLM's decisionmaking in the first place.

The government fails to distinguish between an administrative challenge to BLM's permit denials and a takings claim:

> It is true that in some circumstances it might be more efficient to cure legal defects in the contested governmental action rather than forcing the government to pay for appropriated property, but if the government has taken property and has done so in a legally improper manner, it has committed two violations of the property-owner's rights. The two separate wrongs give rise to two separate causes of action, and the property-owner may elect to sue for just compensation or to seek relief for the legal improprieties committed in the course of the taking.

*Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363–64 (Fed.Cir. 1998); *accord Cristina*, 40 Fed.Cl. at 578. In the instant case, contrary to the government's assertion, the remedy sought by plaintiffs is not "reversal of the BLM application of the Potash Order policy." Def.'s Resp. to Pls.' Opp. to Mot. to Dismiss at 7. Although plaintiffs initially chose to join the other lessees in challenging BLM's permit denials at the IBLA, plaintiffs abandoned that path and chose instead to file a takings claim in this court. Thus, plaintiffs need not establish that BLM's permit denials were

proper or improper to ripen their takings claim. *Del–Rio Drilling*, 146 F.3d at 1363 ("If the government appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the government's conduct leading to the taking was wrongful, and regardless of whether the plaintiff could have challenged the government's conduct in another forum."); *Cristina*, 40 Fed.Cl. at 578 (noting that "a takings plaintiff will often erroneously assert that challenges to the permit denial legally affect the ripening of his takings claim"). Because "a property owner is not required to exhaust remedies directed at reversing the government denial in order to bring a takings claim in this court," *Cristina*, 40 Fed.Cl. at 578, plaintiffs' failure to appeal the permit denials to the IBLA does not prevent the ripening of their takings claim.

*B. Standing to Bring Takings Claim*

In addition to challenging plaintiffs' taking claim on the ground of ripeness, the government also posits that several plaintiffs[7] lack standing to bring a takings claim because they do not own a recognized property interest in the Subject Leases. The MLA provides that "any oil or gas lease issued under the authority of this chapter may be assigned or subleased, as to all or part of the acreage included therein, subject to final approval by the Secretary. . . . Until such approval, however, the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed." 30 U.S.C. § 187a. The government reasons from this provision that the plaintiffs whose transfers were not approved by the Secretary of the Interior "have no recorded interest in the leases and thus no 'property right' to be taken by the allegations in the Complaint." Def.'s Mot. to Dismiss at 15. The court disagrees.

■ The transfer approval and recording provisions of the MLA serve BLM's internal

---

7. The government posits that the following plaintiffs lack a valid property interest: L. Edward Innerarity, Jr.; Nortex Corp.; Northern Bank of Texas as trustee of the Mary Patricia Dougherty Trust; Obie & Co.; Mary M. Olson; Otto E. Schroeder, Jr.; Catherine M. Grace; and Tek Properties, Ltd.

administrative needs, and failure to abide by the provisions does not impact the substantive property interests properly transferred to an assignee. The approval requirements ensure that BLM at all times has on record a responsible party that can be held accountable to the government for the performance of all lease obligations and determine to whom BLM is required to give notice. *See* 30 U.S.C. § 187a; *Tenneco Oil Co.*, 63 IBLA 339, 341 (1982) ("[W]e expressly hold that the de facto assignee of a preexisting oil and gas lease which is held by BLM to have been terminated by operation of law does have standing to appeal that decision to this Board, even though the assignment has not yet been approved by BLM. We do not hold, however, that BLM is required to give separate notice to such an assignee."). Thus, when the identified plaintiffs failed to file a proper Transfer of Operating Rights form and seek approval from the Secretary, the transferors effectively agreed to remain accountable to BLM for all lease obligations, and plaintiffs forfeited any right to receive notice from BLM. Such an agreement, however, does not negate the otherwise proper transfer of property interests to plaintiffs. *See, e.g.*, 43 C.F.R. § 3106.1(b) (stating that the transfer of a lease or lease interest "shall not be recognized *by the Department*" until approved, and providing that if a transfer approval is filed late, "the authorized officer may require verification that the transfer is *still* in force and effect").

 Although the lack of BLM approvals might impact plaintiffs' rights in their dealings with BLM, it does not undermine the valid transfer of lease interests to plaintiffs or diminish plaintiffs' right to protect those interests under the Takings Clause of the Fifth Amendment. *See Pan Am. Petroleum Corp. v. Gibbons*, 168 F.Supp. 867, 872 (D.Utah 1958) ("It does not follow that the assignments as between the assignor and assignee were not effective before formal approval by the Government.... All we need concern ourselves with here is that an absolute assignment was made without qualification and with immediate effect as between the parties."), *aff'd*, 262 F.2d 852, 854 (10th Cir.1958). Because state and common law govern property rights, *see Eastern Miner-*

*als Int'l*, 36 Fed.Cl. at 548, *Store Safe Redlands Assocs. v. United States*, 35 Fed.Cl. 726, 733 (1996), and all plaintiffs possess real property interests under New Mexico law, *see Bolack v. Underwood*, 340 F.2d 816, 820 (10th Cir.1965), *Fullerton v. Kaune*, 72 N.M. 201, 205, 382 P.2d 529 (1963), the court denies the government's motion to dismiss for lack of standing.

### C. Privity for Breach of Contract Claim

The government moves to dismiss plaintiffs' breach of contract claim for lack of privity because no plaintiff listed in the original complaint is a record holder of title on any of the three Subject Leases. Thus, the government argues, the plaintiffs listed on the original complaint, all of whom allegedly hold only operating rights or royalty interests, lack privity of contract with the government.

Marathon Oil, the record title holder on Leases '4441 and '5444A, was added as a plaintiff to this suit in the first amended complaint. In the government's response to plaintiffs' opposition to its motion to dismiss, the government concedes that Marathon Oil is the record title holder on Leases '4441 and '5444A. *See* Def.'s Response to Pl.'s Opp. to Def.'s Mot. to Dismiss at 3 n. 1. Given that the court allowed plaintiffs' first amended complaint adding Marathon Oil, *supra*, those plaintiffs alleging breach of contract on Leases '4441 and '5444A no longer suffer from a lack of contractual privity with the government. The court therefore finds the government's motion to dismiss for lack of privity on Leases '4441 and '5444A to be without merit.

Unlike Leases '4441 and '5444A, Lease '5444 is owned by Mobil, which is not a plaintiff in this suit. Plaintiffs, however, have moved this court to issue notice pursuant to RCFC 14(a)(1) and (b) to Mobil and other non-party holders of property interests in the Subject Leases, inviting them to join the proceedings. Even assuming Mobil chooses not to join this suit after receiving notice under Rule 14, plaintiffs contended at oral argument that other parties holding in the same chain of title as Mobil, through assignments and conveyances by Mobil, would "stand in the shoes of Mobil" and could assert a breach claim under

Lease '5444. Trans. of July 20, 1999 Oral. Arg. at 43.

Plaintiffs' amended motion to issue notice, filed January 11, 1999, is hereby granted as to Mobil only, and the court defers any ruling on the viability of a breach claim under Lease '5444 to await Mobil's response to the Rule 14 notice. If Mobil fails to respond to the Rule 14 notice within 40 days of receipt, the court will presume that Mobil does not intend to join this suit, *see* RCFC 14(c)(1), (g), and the court will rule on the viability of plaintiffs' breach claim under Lease '5444 at that time.

## CONCLUSION

For the forgoing reasons, the court finds that plaintiffs were entitled to file their first amended complaint without leave of the court, that the takings claim is ripe for consideration, and that plaintiffs possess standing to assert that claim. Plaintiffs' breach of contract claims based on Leases '4441 and '5444A are proper, as plaintiffs under those leases possess privity of contract with the United States. The court defers its ruling on the government's motion to dismiss plaintiffs' breach of contract claim based on Lease '5444 until Mobil has had 40 days from receipt to respond to this court's Rule 14 notice to join plaintiffs' suit. Accordingly, the government's motion to dismiss is denied in part and stayed in part.